UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION



| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 12-CR-0860 YGR |
| | **ORDER DENYING REQUEST FOR BAIL PENDING APPEAL** |
| vs. | |
| SALEEM M. KHAN, | |
| Defendant | |

## I.     INTRODUCTION

Pending before this Court is defendant Saleem M. Khan's Motion for Bail Pending Appeal. (Dkt. 66.)  The Court sentenced Mr. Khan on March 13, 2014 to a 21-month custodial sentence after he entered an "open" guilty plea to one count of bank fraud in violation of Title 18 U.S.C § 1344 and one count of making false statements to a financial institution in violation of Title 18 U.S.C § 1014. The Court allowed Mr. Khan to self-surrender on June 23, 2014.  On June 18, 2014, five days before his surrender date, the defendant filed the instant motion for bail pending appeal.  The Court extended the surrender date one week to provide the Court with sufficient opportunity to analyze the last-minute request.  On June 23, 2014, the Government filed an opposition to the motion and on June 25, 2014, defendant filed a reply, including his declaration.  (Dkts. 69, 71, 72.)

For the reasons set forth below, the Court **DENIES** the motion and provides this written Order pursuant to Federal Rule of Appellate Procedure 9.

## II.     BACKGROUND

A comprehensive factual background is set forth in the Presentence Investigation Report ("PSR" at Dkt. 36) to which no one filed an objection.  (PSR at 17.)  The Court finds these facts to be undisputed.  The PSR provides in pertinent part:

United States District Court
Northern District of California

....On September 2, 2005, Khan obtained a home equity line of credit from E-Loan regarding [an] Appian Way residence in the amount of $345,000 ("HELOC" or "HELOC loan"). On October 3, 2005, a deed of trust securing the HELOC was filed with the Alameda County Recorder's Office with respect to the Appian Way residence. (¶ 8.)

On October 25, 2005, E-Loan sold the HELOC loan to E-Trade. Thereafter, E-Trade utilized PNC to service the HELOC loan. As of January 2010, Khan's outstanding principal balance on the HELOC was approximately $344,850. ... (¶ 9.)

Beginning no later than July 2010, and continuing to approximately March 2011, Khan knowingly devised and executed a scheme to defraud PNC and E-Trade in order to obtain more than $299,850 in funds owed on the HELOC secured by the Appian Way residence and the deed of trust securing the HELOC.... (¶ 10.)

In furtherance of the scheme, after about January 2010, Khan stopped making payments on the HELOC loan.  On July 13, 2010, Khan falsely stated in a telephone call with a PNC representative that the reason that he had defaulted on payments on the HELOC loan was that he had been laid off from his job for 14 months. On October 29, 2010, the HELOC loan was charged off by PNC, with E-Trade's concurrence, and referred to PNC's recovery department, which operated as a division of PNC known as CLC Consumer Services. Thereafter, Khan told a default specialist in PNC's recovery department that he was in financial hardship and wanted to settle the loan. (¶ 11.)

...On January 13, 2011, in response to a request from the PNC default specialist, Khan sent an e-mail from the Northern District of California to the default specialist in Pennsylvania, which included attached documents supporting his offer to settle the HELOC for $45,000.  These documents included (a) a so-called hardship letter in which Khan falsely stated that he had lost his job at the end of 2007 and was not able to secure a stable job until July 2010; (b) altered pay statements falsely indicating that Khan was employed by AB Star Group, from which he purportedly received a bi-weekly net salary of approximately $1,900; and (c) an income and expense statement falsely listing a monthly income of $4,117. Khan involved his nephew, Kamran Khan, in altering Khan's pay statements reporting that Khan was employed by AB Star Group. (¶ 11.)

In truth, at the time of his January 13, 2011 e-mail, Khan had been nearly continuously employed since July 1995. Further, in December 2008, Khan began working as a consultant for Kaiser Permanente. On July 29, 2009, Khan was hired as a full-time employee of Kaiser Permanente, with a bi-weekly net salary of approximately $3,190 in January 2011. At no time was Khan ever an employee of AB Star Group. Moreover, between April 2010 and January 2011, Khan earned more than $870,000 by buying and selling options and by conducting other transactions through brokerage accounts, which income was not disclosed in the income and expense sheet that Khan submitted to PNC on January 13, 2011. (¶ 12.)

In advance of sentencing, the defendant provided Probation with a written statement admitting in

United States District Court
Northern District of California

pertinent part as follows: "I illegally settled my HELOC with the bank to benefit myself in the amount of $299,850." (¶ 18.)  As set forth above, the scheme began in approximately January 2010 when Mr. Khan stopped making payments on the HELOC.  The write off of the loan did not occur until October 29, 2010.

## III.   LEGAL STANDARD

Section 3143(b)(1) provides, subject to exceptions not relevant here, that following conviction and sentencing a defendant "who has filed an appeal or petition for a writ of certiorari" **must** "be detained, unless the judicial officer finds":

> **(A)** by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; *and*
>
> **(B)** that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--
>
> > **(i)** reversal,
> >
> > **(ii)** an order for a new trial,
> >
> > **(iii)** a sentence that does not include a term of imprisonment, or
> >
> > **(iv)** a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

(Emphasis supplied.)  Through this statute Congress created a presumption of detention and shifted the burden of proof to the defendant to show otherwise.  *See United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985); *accord United States v. Gilchrist*, C 06-00538 SI, 2010 WL 5387671, at *1 (N.D. Cal. Dec. 21, 2010) (Illston, J.).

Findings related to whether a defendant is likely to flee, pose a danger to others, or act for purposes of delay are fact based issues.  To determine whether a "substantial question of law or fact" exists which would result in one of the four enumerated items, the analysis is different.  The *Handy* court held that "the phrase 'likely to result in reversal' (in that case) defines the *type of question* that must be presented." *Handy*, 761 F.2d at 1281.  (Emphasis supplied.)[1]  The "word 'substantial' defines

---

[1] Since *Handy* was decided, section 1381(b)(1)(B) has been amended to add subparagraphs (iii) and (iv), adding sentencing considerations to reversal of conviction and new trial.  The Ninth

3

the level of merit required in the question raised on appeal." *Id.* Thus, the analysis, by definition, must be viewed in the context of the four enumerated results. While a Court is tasked with identifying the *kind* of question presented, it should *not* weigh the likelihood of an appellate ruling in defendant's favor. For this proposition, *Handy* endorsed the Third Circuit's reasoning in *Miller*. *See* 761 F.2d at 1281 (citing *United States v. Miller*, 753 F.2d 19 (3d Cir. 1985); *United States v. Giancola*, 754 F.2d 898 (11th Cir. 1985)). The *Miller* court wrote:

> [T]he phrase "likely to result in reversal or an order for a new trial" cannot reasonably be construed to require the district court to predict the probability of reversal. The federal courts are not to be put in the position of "bookmakers" who trade on the probability of ultimate outcome. Instead, that language must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal. A question of law or fact may be substantial but may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no prejudicial effect, or to have been insufficiently preserved. A court may find that reversal or a new trial is "likely" *only if it concludes that the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.*

*Miller*, 753 F.2d at 23 (emphasis supplied); *accord Giancola*, 754 F.2d 898; *Handy*, 761 F.2d at 1281. Thus, in analyzing the first part of the issue, the question must be whether, if an appellate ruling is decided in defendant's favor, it is "likely to result in" the outcomes enumerated in Section 3143(b)(1)(B). *Accord United States v. Gilchrist*, C 06-00538 SI, 2010 WL 5387671, at *3 (N.D. Cal. Dec. 21, 2010) (Illston, J.) (citing *Handy*, 761 F. 2d at 1283) ("Likely to result in reversal means that if the substantial question is determined favorably to the defendant on appeal, that decision is likely to result in reversal or an order for a new trial.").

*Miller* only addressed reversals and new trials, as to the other two outcomes enumerated in Section 3143(b)(1)(B), "neither the Ninth Circuit nor any other appellate court has interpreted" those

---

Circuit has expressly held that those amendments do not affect the analysis of *Handy*. *United States v. Garcia*, 340 F.3d 1013, 1021 n.5 (9th Cir. 2003).

United States District Court
Northern District of California

terms.  *Id.*  Subsections (B)(iii) and (B)(iv) "are significantly less amenable to an objective test, as the district court has considerable discretion while resentencing, which an appellate court lacks when deciding whether or not a mistake of law requires reversal or an order for a new trial."  *Id.*  Thus, even after having found a substantial question of law, in *Gilchrist*, Judge Illston denied bail because, even assuming the defendant prevailed on his appeal, he "would be likely to receive the same sentence."  *Id.* at *5.

With respect to the second part of the analysis, i.e. whether a "substantial question" exists, the term has been found to mean "one that is fairly debatable or fairly doubtful."  *United States v. Montoya*, 908 F.2d 450, 451 (9th Cir. 1990) (citing *Handy*, 761 F.2d at 1283; *D'Aquino v. United States*, 180 F.2d 271, 272 (11th Cir. 1950)).  "Fairly debatable or fairly doubtful" mean the question "is one of more substance than would be necessary to a finding that it was not frivolous."  *Id.*; *see also United States v. Gilchrist*, C 06-00538 SI, 2010 WL 5387671, at *1 (N.D. Cal. Dec. 21, 2010) (citing *Montoya*, 908 F.2d at 451) (satisfying section 3143(b) "requires more than a mere identification of an issue that is non-frivolous" but ultimately denying motion for failure to show that prevailing on appeal would result in a reduced sentence, due to the level of discretion district courts possess over sentencing.  *Id.* at *4-5.)  Within this legal framework, the Court sets forth its analysis.

## IV.  ANALYSIS

### A.  FIRST ELEMENT REQUIRING CLEAR AND CONVINCING EVIDENCE

Mr. Khan's evidence concerning whether he is a flight risk is grounded principally in his pre-conviction status.[2]  The Court acknowledges that he is a United States citizen, a longtime resident of the Bay Area with his wife and children who also live here, and that prior to his conviction, he

---

[2] The Government does not argue that the defendant poses a danger to the safety of any other person or the community.  Nor does the Court so find.

traveled to Pakistan and returned.  In essence, the defendant requests that the Court trust him implicitly to remain in the country for an indefinite term pending his resolution of a complaint filed against him by the Securities and Exchange Commission.  *Securities and Exchange Commission v. Khan*, 14-cv-2743-EMC (C.A.N.D. 2014).

The Court is not persuaded nor does it trust the defendant to remain here for numerous reasons.  First, all of defendant's eight siblings live in Pakistan.  He therefore has access to an established family network in another country with whom he has stayed connected.  He also maintains assets there.  His ability to flee is greater than others similarly situated.

Second, Mr. Khan's conduct during the sentencing proceedings and thereafter give the Court grave concern that he never fully appreciated that he would be incarcerated.  Rather, he entered a plea on the ill-founded hopes that the Court would give him a probationary sentence.[3]  During the sentencing arguments, Mr. Khan physically appeared shocked shaking his head repeatedly when he realized that the Court was not accepting his view that his crime involved "no real loss." (Dkt. 39 at 8:1.)  The instant motion, brought on the eve of his incarceration, evidences a desperate attempt to avoid incarceration.

Third, Mr. Khan now faces the additional prospect of a judgment against him requiring disgorgement of millions of dollars of illegal trading profits with potentially significant civil penalties. The argument that he cannot be incarcerated because he needs to prepare his defense rings hollow. Mr. Khan's incarceration will inconvenience his preparation, but not bar it.  Further, there is no estimate how long the case will be litigated.  He may be out of custody well in advance of its resolution.

Based on the evidence before it, the Court is not convinced that Mr. Khan will not flee to

---

[3] Notably, although Mr. Khan pled guilty, he appealed both his sentence and conviction, not just the sentence imposed in contravention of his arguments. (Dkt. 49.)

United States District Court
Northern District of California

avoid incarceration.  A $99.00 ticket to Portland, Oregon does not prove otherwise.  (See Khan

Reply.)  Not once has Mr. Khan himself demonstrated to the Court in his words or manner, a genuine

acceptance that he stole a significant amount of money from a financial institution by lying and

falsifying documents and that he personally used those funds for his own benefit to purchase other

real estate.  The Canadian border is not that far from Portland and the defendant has an estimated four

million dollars in assets to assist him if necessary.  Mr. Khan has both the means and the motive to

flee.

On this basis alone, the Court could deny the motion.  Nevertheless, the Court proceeds with

additional analysis.

## B.  SECOND ELEMENT RE NATURE OF APPEAL

Mr. Khan argues in his motion that his appeals in this matter will present "substantial

questions of fact and law" that, if meritorious, are likely to result in a "new sentencing and restitution

hearing."  (Motion at 1:20-21.)

First, there are no substantial questions of fact to be resolved.  Second, the argument that a

restitution order may be reversed or modified is of no consequence to the analysis as a change in that

result does not fall within the scope of Section 3143(b)(1)(B).  Thus, Mr. Khan's only remaining

argument then is that the Government failed "to meet its burden of proof of loss at sentencing" with

respect to the sentencing enhancement and that while "'the court need only make a reasonable

estimate of loss;' U.S.S.G. § 2B1.1, cmt. n. 3(C); the Guidelines specify the sentencing judge must

take into account 'the fair market value of the property.'  U.S.S.G. § 2B1.1 cmt. n. 3(C)(i)."[4]  (Motion

---

[4] The quoted section does not undermine the Court's calculations and, in fact concerns distinctly
different kinds of property interests.  It reads, as follows, in its entirety:

*(C) Estimation of Loss.—The court need only make a reasonable estimate of the loss. The*
*sentencing judge is in a unique position to assess the evidence and estimate the loss based upon*

at 3:26-4:4.)  He further suggests that the Court was required to determine the loss "at the time of the settlement" (*id*. at 5:2-3) in October 2010 rather than at any other time, including when the scheme began in January 2010.[5]

Given the weakness of his argument, the defendant does not even attempt to link the issue of the alleged "substantial question" to an enumerated result under subsection (B).  Said differently, even if a "substantial question of law" exists, unless it is *likely to result* in one of the four enumerated results, the Court must detain the defendant.  While defendant makes no showing and the Court could simply deny the motion given his failure, the Court reviews the issues briefly.

Even assuming defendant could identify a "substantial question," the resolution of that question is not likely to be one of "no imprisonment" or a "reduced sentence" under subsection (B)(iii-iv).  As noted, Mr. Khan's argument focuses on the impact of the Court's calculation of the loss attributable to his criminal acts on his sentence.[6]  Not only does the defendant's argument ignore the

---

*that evidence. For this reason, the court's loss determination is entitled to appropriate deference. See 18 U.S.C. § 3742(e) and (f).*

*The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:*

> *(i) The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.*

[5] That is, the defendant would prefer for the analysis to center on the value of his loan in default rather than one which is in good standing.  Mr. Khan has never provided any authority for this perspective, especially given that the scheme itself required that the loan be in default status to give the false appearance of a low-value loan.  Nor does he ever address the opposite economic principle that well-performing loans (as his was in 2009) in markets where interest rates are falling (such as they were in 2008-2010) can increase in value, not decrease.

[6] The record reflects that at sentencing the defendant argued that "there is no real loss in this case, and the guideline calculation should result in in (sic) a total offense level of 5." (Dkt. 39 at 8:1-2.) No one disputes the Criminal History Category of I.  At a level 5, the resulting Guideline range would be zero to 6 months, rather than the adjusted level of 16 found by the Court, with its resulting Guideline range

victim's affirmative showing of loss but his own admission that he acted "illegally" to "benefit [him]self in the amount of $299,850." (PSR at p. 6.) Moreover, the Guideline range cannot and does not dictate sentencing decisions. Since the Supreme Court's decision in *Booker*, Guidelines are now neither mandatory nor presumed reasonable. *United States* v. *Booker,* 543 U.S. 220 (2005); *see also Pepper v. United States,* 131 S. Ct. 1229, 1245 ( 20  ); *Nelson v. United States,* 555 U.S. 350, 129 S. Ct. 890, 892 (2009); *Rita* v. *United States,* 551 U.S. 338 (2007); *Kimbrough v. United States,* 552 U.S. 85, 90-91 (2007); *GalU. United States,* 552 U.S. 38, 50 (2007); *United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2008). Accordingly, district courts at sentencing have an "overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary,' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper,* 131 S. Ct. at 1242. The Guideline range is only one factor for the district court to consider in making this judgment, but it may not be weighed more heavily than any other statutory factor. *Gall,* 552 U.S. at 50; *Carty,* 520 F.3d at 991.

As the Court indicated during the lengthy sentencing hearing, the Guideline calculation was but one component in its analysis. The Court also considered all of the factors under Title 18 U.S.C. 3553(a) and indicated at sentencing that even if a different calculation was appropriate and resulted in a lower range, then an upward variance would have been warranted in light of the circumstances of this case. Here, the defendant had advanced degrees and is a wealthy, sophisticated investor with a master's in corporate finance who used his specialized expertise to accomplish, intentionally and underhandedly, the bank fraud to which he pled guilty. Unlike many defendants whose financial hardship motivates financial crimes, here, the only apparent motive was greed. Further, defendant involved his nephew in the scheme. Given the circumstances of his white collar offenses, the need for

of 21 to 27 months. Despite claiming "no real loss" because of a "write down" of the loan, the defendant never addressed the fact that even Exhibit A attached to his sentencing memorandum showing the "write down" reflected a loss in the estimated value of the loan in October 2010 which at a minimum would have resulted in an enhancement and a sentencing range beginning at 12-18 months. (Dkt. 39, Exh. A.)

United States District Court
Northern District of California

a custodial sentence of sufficient length was appropriate to reflect the seriousness of the offense, promote respect for the law, and, quite importantly, afford deterrence to further and similar criminal conduct. A non-custodial sentence would not achieve any of those goals for this defendant. Rather, a non-custodial sentence would encourage, not deter, him and others similarly situated to proceed with financial crimes, reap the financial benefit, and then expect the proverbial slap-on-the-hand as punishment. Just punishment in this case required that the Court withhold the one item that defendant's significant wealth could not purchase, his liberty. Only with a custodial sentence would this particular defendant begin to appreciate the extent of his criminal conduct and begin the process of self-reflection and rehabilitation.

It is not "fairly debateable" or "fairly doubtful" that the Court could consider all of the factors set forth above or defendant's own admission of the benefit he received. However, even if Mr. Khan prevailed, the case would be remanded for sentencing as to the enhancement only. Based on the information currently before the Court, and acknowledging that any new sentence would be imposed after a renewed process, the Court believes that Mr. Khan would receive the same sentence. Even if required to reject the victim's statements of damage which placed the loss at $313,665.98 at the time of sentencing, and mandated instead to consider the defendant's complicated approach in valuing one particular loan in a financial institution's portfolio at the time that the scheme was most advantageous to the defendant's arguments, the fact remains that the defendant received $299,850 and used the funds for his own gain. Under the Guideline commentary for Section 2B1.13, application note 3(B), the Court believes that under all measures a loss does exist and therefore as an alternative, the Court was entitled to consider "the gain that resulted from the offense as an alternative measure of loss...." Thus, it is not likely that if Mr. Khan's appeal is granted, the result will be a lower term of imprisonment.

V.    CONCLUSION

For the foregoing reasons, and for good cause shown, the **COURT FINDS DEFENDANT SALEEM M. KHAN** has failed to show by clear and convincing evidence that he is not a flight risk and that a substantial question of law or fact does not exist which would likely to result in a sentence that does not include a term of imprisonment.  Section 3143(b)(1)(A) and (B).

This Order terminates Docket 66.

**IT IS SO ORDERED.**

Date: June 27, 2014

_____
**HON. YVONNE GONZALEZ ROGERS**
**United States District Judge**